Sheehan & Associates, P.C.
Spencer Sheehan
spencer@spencersheehan.com
(516) 303-0552

| | |
|---|---|
| United States District Court<br>Eastern District of New York | 1:19-cv-00768 |
| Lashawn Sharpe and individually and on behalf of all others similarly situated<br><br>       Plaintiff<br><br>    - against -<br><br>A & W Concentrate Company and Keurig Dr Pepper Inc.<br><br>        Defendant | <br><br><br><br>Complaint |

    Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

    1.  A & W Concentrate Company and Keurig Dr Pepper Inc. ("defendants") manufacture, market, distribute, bottle and sell "root beer" and "cream soda" carbonated soft drinks ("CSD" or "soda") under the A & W brand.

    2.  The Products are sold in plastic and glass bottles and aluminum cans, in sizes such as 12 oz, 20 oz and 2 liters (67.6 oz), sold to consumers individually or in cases, from brick-and-mortar stores and online, by third-parties.

    3.  Root beer and cream soda are inextricably linked through their association with the coffee shops of their era – the luncheonette – and their principal flavoring component – vanilla.

    4.  Until the bottling industry matured to enable mass production, sodas were commonly handmade and dispensed at the soda fountain, a staple of every lunch counter, whether in a pharmacy, five-and-dime store or department store.

5. Though it is unknown who pioneered the idea of adding ice cream to carbonated water, this confection was an original "loss leader," due to the labor-intensive process of preparing and cleaning the porcelain or glass serving cup.

6. The delicacies were served up by the baristas of their day – "soda jerks" – who took pride in their craft which was surprisingly detailed.[1]

7. Ice cream floats were a popular invention around the very end of the 1800's - they were sold in pharmacies which kept carbonated water and flavored syrups on hand to serve to customers.

8. Root beer was also a soda which saw great success when mixed with vanilla ice cream, and to this day it is called a "root beer float."

9. The "original" ice cream soda may have relied on the most popular flavor of ice cream – vanilla – as the "cream" in the "cream soda" name.

10. However, it has been argued that the "cream" flavor provided by cream soda actually derived from vanilla.

11. This hypothesis draws support from scientific studies showing that vanilla can trigger identify a flavor as creamy without any textural changes.[2]

12. The representations lead consumers to reasonably believe that Defendants' soft drink is made from, and contains, real vanilla extract, and that consumers who drink the soft drink will be engaging in a "healthy indulgence" if they had consumed Products made with real vanilla and will be receiving value for their dollar.

13. In truth, Defendants' soft drink is not made from real vanilla but from carbonated

---

[1] *Standard Manual of Soda and Other Beverages*, 1897.
[2] Sarah V. Kirkmeyer et al., "Understanding creaminess perception of dairy products using free-choice profiling and genetic responsivity to 6-n-propylthiouracil," *Chemical Senses* 28.6 (2003): 527-536.

water, high fructose com syrup, preservatives, and a chemical flavor compound manufactured to mimic the taste of vanilla but with none of the actual flavorings, benefits or value of real vanilla.

14.     Defendants prominently made the claim "MADE FROM AGED VANILLA" on the front label panel of its Products cultivating a wholesome and natural image in an effort to promote the sale of its soft drink and to compete with small batch vanilla beverages that do use real vanilla.



15.     the barrel imagery fosters the impression that even though the products are obviously not made in a barrel anymore, the products contain *ingredients* which could be used in the era where soda in a barrel was commonplace.



16. The extra-label representations – on the defendants' website www.rootbeer.com and in images provided to third-parties– promote the connection of vanilla to the Products – through the connection to vanilla ice cream.




4



17. Consumers value the representation "MADE FROM AGED VANILLA" because studies have found that real vanilla simulates a creamy texture, satisfying consumers' needs for consumption of fat-rich foods, without the actual fat and calories.

18. Consumers also value it because it is the ideal combination of spice and sweet – contrary to its dictionary definition of "plain."

19. Defendants' product labels did not disclose that the soft drink contains no real vanilla and that the products' vanilla content is non-existent or minimal, because if there were real vanilla, the ingredient list would indicate this as required and permitted by law.

20. The Products' contain direct and/or indirect representations with respect to the primary recognizable flavors of the foods – vanilla.

21. The result is a labeling scheme that is designed to mislead consumers, and which does so effectively.

22. This is because the ingredient lists on the Products indicate they do not contain "aged vanilla," "vanilla" or any other kind of vanilla.

| Root Beer[3] | Cream Soda |
|---|---|
| CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, CARAMEL COLOR, SODIUM BENZOATE (PRESERVATIVE), NATURAL AND ARTIFICIAL FLAVORS, QUILLAIA EXTRACT. | CARBONATED WATER, HIGH FRUCTOSE CORN SYRUP, SODIUM BENZOATE (PRESERVATIVE), CARAMEL COLOR, CITRIC ACID, YUCCA EXTRACT, NATURAL AND ARTIFICIAL FLAVORS. |

---

[3] The non-diet root beer and cream sodas contain high fructose corn syrup while the diet versions contain aspartame.

6

23. Each Product's ingredient list discloses that it is instead flavored with compounds identified as "natural and/or artificial flavor."

24. These Products in fact owe their characterizing flavors to Defendant's use of artificial and natural flavors, which are not derived from real vanilla.

25. The relevant differences are quillaia extract in the root beer and yucca extract in the cream soda.

26. It is misleading to claim the Products are "Made With Aged Vanilla" because the vanilla bean is the fruit of the vanilla plants.

27. The vanilla bean is not consumed by itself – it is necessary to scrape the seed from the pod, infuse it or extract it.

28. Various commercial products are derived from the vanilla plant including extracts, flavor, powder and vanillin.

29. Vanilla extracts are considered the product type most equivalent to "vanilla" and are defined by regulations as solution in aqueous ethyl alcohol of the sapid and odorous principles extractible from vanilla beans.[4]

30. Ethyl alcohol content of such an extract is not less than 35% by volume, and the extractable matter of one or more units of vanilla constituent.

31. A unit of vanilla constituent is 13.35 oz of beans containing not more than 25% moisture per gallon of finished extract.

32. This amounts to the extractible matter of not less than 10.0125 oz of beans on the moisture-free basis.

33. This means that the weight of beans to manufacture each gallon of vanilla extract can

---

[4] 21 C.F.R. § 169.175 ("Vanilla extract.") 21 CFR 169.175–169.182,

vary, depending on the moisture content of the beans.

34. Vanilla flavoring is similar to vanilla extract but contains less than 35% ethyl alcohol by volume.

35. Where a product claims to be made with actual vanilla but is made with flavors that simulate vanilla – derived from non-vanilla plants – it is misleading to consumers.

36. The Products contain derivatives chemically related to the vanilla bean but not from the vanilla bean.

37. Consumers are led to believe that they would obtain the real vanilla extract or flavor when, as a matter of fact, the product was not vanilla extract, but was a compound and imitation substituted in its place.

38. Defendants actions were undertaken to compete with the rise of artisanal beverage producers who include actual vanilla, derived from the vanilla plant, in their products.

39. The fluctuations in vanilla supply has caused companies like defendant to rely on flavoring which purports to simulate vanilla extract, which is not feasible given the number of unique compounds contained in the vanilla bean.

40. To the extent the Products disclose the presence of natural and artificial flavors, this is <u>in addition to</u> the claims that the Products are "Made with Aged Vanilla."





41. The result is the consumer has no way to tell if real vanilla is a part of the natural and artificial flavors.

42. Moreover, if the consumer would look at the ingredient list, they would see ingredients like "quillaia extract" and "yucca extract," exotic sounding names, giving them confidence that "real vanilla must be in there somewhere because it's got these other natural, plant sounding ingredients."

43. The Products contain other representations which are misleading and deceptive.

44. Excluding tax, the Products cost no less than $1.99 per 12 oz, a premium price compared to other similar products.

Jurisdiction and Venue

45. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2).

46. Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

47. This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

48. Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and in New York.

49. A substantial part of events and omissions giving rise to the claims occurred in this District.

## Parties

50. Plaintiffs are citizens of Kings County, New York (1) and Cook County, Illinois (2).

51. Defendant A & W Concentrate Company is a Delaware corporation with a principal place of business in Plano, Texas.

52. Defendant Keurig Dr Pepper Inc. is a Delaware corporation with a principal place of business in Burlington, Massachusetts.

53. In 2016, 2017 and/or 2018, plaintiff 1 purchased one or more Products for personal consumption as represented herein, for no less than $1.99 per (12 oz) product, excluding tax, within this district and/or State and plaintiff 2 purchased in the corresponding district to residence.

54. Plaintiffs paid this premium because prior to purchase, plaintiffs saw and relied on the misleading representations.

55. Plaintiffs would purchase the Products again if there were assurances that the Products' representations were no longer misleading.

## Class Allegations

56. The classes consist of all consumers in the following states: <u>all</u>, <u>New York</u> who purchased any Products with actionable representations during the statutes of limitation.

57. A class action is superior to other methods for fair and efficient adjudication.

58. The class is so numerous that joinder of all members, even if permitted, is impracticable, as there are likely hundreds of thousands of members.

59. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff(s) and class members are entitled to damages.

60. Plaintiff(s) claims and the basis for relief are typical to other members because all were subjected to the same representations.

61. Plaintiff(s) is/are an adequate representative because his/her/their interests do not conflict with other members.

62. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

63. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

64. Plaintiff(s) counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

65. Plaintiff(s) seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350 and Illinois Consumer Fraud and Deceptive Business Practices Act</u>

66. Plaintiffs incorporates by references all preceding paragraphs.

67. Defendants' representations are false, unfair, deceptive and misleading

68. Defendants' acts, practices, advertising, labeling, packaging, representations and

omissions are not unique to the parties and have a broader impact on the public.

69. Plaintiff desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

70. The representations and omissions were relied on by plaintiff and class members, who paid more than they would have, causing damages.

### Negligent Misrepresentation

71. Plaintiffs incorporates by references all preceding paragraphs.

72. Defendant misrepresented the composition of the Products.

73. Defendants had a duty to disclose and/or provide non-deceptive labeling of the Products and knew or should have known same were false or misleading.

74. This duty is based, in part, on the representations that the Products were "Made With Aged Vanilla" because vanilla is the singularly most favorable spice used in everyday consumer products.

75. Defendant negligently misrepresented and/or negligently omitted material facts.

76. Plaintiffs reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Products.

77. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, thereby suffering damages.

### Breach of Express Warranty and Implied Warranty of Merchantability

78. Plaintiff incorporates by references all preceding paragraphs.

79. Defendants manufactures, labels and sells Products purporting to be derived from aged vanilla which is deceptive because all vanilla is "aged" in that the extractives need time to release the odorous substances contained therein and the Products do not contain any actual vanilla.

80. The representations warranted to plaintiff and class members that they contained constituents which were a part of the vanilla plant and had those qualities associated therewith.

81. Defendant warranted such attributes to plaintiffs and class members, when this was not truthful and was misleading.

82. Defendant owed a special duty based on its responsibility as one of the largest grocery sellers in the nation.

83. The Products did not conform to their affirmations of fact and promises, wholly due to defendant's actions.

84. Plaintiff and class members relied on defendant's claims, paying more than they would have.

## Fraud

85. Plaintiffs incorporates by references all preceding paragraphs.

86. Defendants purpose was to mislead consumers who increasingly seek products from upstart competitors which use real vanilla-derived ingredients in beverages.

87. Defendants' purpose was to highlight a wholesome and natural ingredient in a product category which has been trending downwards owing to awareness of the link between sugary soft drinks, obesity and numerous ailments.

88. Plaintiffs and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

## Unjust Enrichment

89. Plaintiffs incorporates by references all preceding paragraphs.

90. Defendants obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of plaintiff and class members,

who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demands a jury trial on all issues.

**WHEREFORE,** plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff(s) as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct such practices to comply with the law;

3. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law, GBL and ICFDBPA claims;

4. Awarding costs and expenses, including reasonable fees for plaintiffs' attorneys and experts; and

5. Such other and further relief as the Court deems just and proper.

Dated: February 7, 2019

          Respectfully submitted,

          Sheehan & Associates, P.C.
          /s/Spencer Sheehan
          Spencer Sheehan (SS-8533)
          505 Northern Blvd., Suite 311
          Great Neck, NY 11021
          (516) 303-0552
          spencer@spencersheehan.com

          Levin-Epstein & Associates, P.C.
          Joshua Levin-Epstein
          1 Penn Plaza, Suite 2527
          New York, NY 10119
          (212) 792-0046

1:19-cv-00768
United States District Court
Eastern District of New York

Lashawn Sharpe and individually and on behalf of all others similarly situated

Plaintiff

- against -

A & W Concentrate Company and Keurig Dr Pepper Inc.

Defendant

Complaint

Sheehan & Associates, P.C.
505 Northern Blvd., #311
Great Neck, NY 11021
Tel: (516) 303-0052
Fax: (516) 234-7800

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: February 7, 2019

    /s/ Spencer Sheehan
    Spencer Sheehan